IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JIMMIE DWAIN MIDDLEBROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:23-cv-196-ECM |
| | ) | [WO] |
| CITY OF EUFAULA, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

Plaintiff Jimmie Dwain Middlebrooks ("Middlebrooks") brings this action against his former employer, Defendant City of Eufaula, Alabama ("the City"), alleging that the City harassed, discriminated, and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.  Now pending before the Court is the City's motion for summary judgment. (Doc. 14).  The motion is fully briefed and ripe for review.  Upon consideration of the briefing, and for the reasons that follow, the motion for summary judgment is due to be GRANTED.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*,

2

475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  STATEMENT OF FACTS

The facts, viewed in a light most favorable to the non-movant, are as follows:

Middlebrooks, a gay male, was unemployed in the summer of 2020 when Chris Dollar ("Dollar"), assistant public works director for the City, encouraged him to apply to work under his supervision. (Doc. 14-2 at 10).  According to Dollar, he knew Middlebrooks was gay at the time from conversations with Middlebrooks' father, whom he had known for decades. (Doc. 18-4 at 5).  In July 2020, the City hired Middlebrooks as an equipment operator in its recycling department. (Doc. 14-1 at 23).  At all relevant times, Dollar was Middlebrooks' supervisor.

While working in the recycling department, Middlebrooks received a disciplinary infraction from Dollar for failing to show up to work on December 24, 2021. (Doc. 14-1 at 17). He received a reprimand but no further discipline.[1] (*Id.*). Sometime into Middlebrooks' stint with the recycling department, Dollar approached him about doing some extra work with garbage collection. (Doc. 14-2 at 5). Middlebrooks initially agreed to help with garbage collection; however, he found this work frustrating because he was not paid any overtime for his extra work, while full-time garbage collectors could complete their assigned duties, leave, and still get paid for eight hours even if they did not work the full day. (*Id.*). According to City records, he was transferred from recycling on February 14, 2022, to work in the garbage department full-time. (Doc. 14-1 at 15). This transfer was requested by Tim Brannon ("Brannon"), the City's director of public works. (*Id.*).

While in garbage collection, Middlebrooks had two different sets of duties. Initially, he picked up trash in one of the City's mini-dump vehicles, driving door to door by himself and collecting trash for residents who could not take it to the street. (Doc. 14-2 at 12). During this time, Middlebrooks could come in, complete his tasks, and get paid for a full eight hours—no matter how long the work took him. (*Id.*). After the City retired its mini-

---

[1] At all relevant times, Middlebrooks was subject to the City's employee handbook. (Doc. 14-4). The handbook lists thirty-two reasons for which an employee may be disciplined and allows for discipline in the form of (1) reprimand, (2) suspension for three days or less, (3) suspension for more than three days, (4) demotion, or (5) termination. (*Id.* at 56–58). If an employee is suspended for more than three days or due to be demoted or terminated, he is entitled to certain procedures. (*Id.*). First, the employee is entitled to a written notice setting out the charges against him and informing him, with at least seven days' notice, of the date of his determination hearing. (*Id.* at 58). At the hearing, which is presided over by either the Mayor or the relevant department head, "evidence against the employee shall be explained and the employee shall be afforded opportunity to respond verbally or in writing." (*Id.*). After the hearing, the Mayor or department head must issue his disciplinary decision within three working days. (*Id.*). "If the decision is to suspend the employee without pay for more than three days, to demote the employee, or to dismiss the employee, the employee has a right to appeal such action." (*Id.*).

dump vehicles, Middlebrooks began working on a larger, automated garbage truck with two other workers at a time.  Middlebrooks did not "see the point of why . . . all three [employees] had to ride in the truck together," and he "asked to go back to recycle because [he] was no longer needed on the trash route." (*Id.*).  Middlebrooks could not remember if, while working on the automated garbage truck, he was able to complete his tasks and leave early while still getting paid for eight hours, as he was able to do when he first transferred into garbage collection. (*Id.* at 13).

On June 6, 2022, soon after the introduction of the new garbage system, Middlebrooks was scheduled to work on a "special crew that would service the handicapped folks that could not push their garbage cans to the road." (Doc. 18-4 at 8). Dollar said Middlebrooks' presence was particularly important that day, as "he was the only one left on that particular crew that had any idea of what was going to need to be done." (*Id.*).  But that morning, Middlebrooks "refused to climb up in the cab of [the] truck with two other guys" because he "didn't want COVID again[,]" and there was an outbreak of "COVID in the department." (Doc. 14-2 at 14–15).  Middlebrooks claims he "wasn't refusing to work.  [He] was begging to do something.  [To] send [him] back to recycle or something." (*Id.*).  He just "did not want to be three men deep in" the garbage truck. (*Id.*). When Dollar was not receptive to this request, Middlebrooks gave him an ultimatum: Dollar could either let him do another job or send him home. (*Id.*).  Dollar then sent Middlebrooks home because "[h]e refused to do his assignment." (Doc. 18-4 at 8).

The next day, June 7, 2022, Middlebrooks again refused to ride in the garbage truck. (Doc. 14-2 at 15).  "[I]n front of a room full of hourly associates" at clock-in time, Dollar

told Middlebrooks he needed to go see Lisa Taylor ("Taylor"), the City's human resources director, and again sent him home. (*Id.*).  Dollar documented these incidents from June 6 and 7, citing Middlebrooks for insubordination because he "refused to work where assigned" on both days. (Doc. 14-1 at 1–5).  Around the same time, Joshua, another employee in the garbage department, requested a different assignment due to concerns with COVID. (Doc. 14-2 at 21).  Joshua's request was granted, and he was transferred to the horticulture department. (*Id.*).  On June 8, 2022, Brannon officially placed Middlebrooks on administrative leave. (*Id.* at 7).

Angela Densel ("Densel"), an administrative assistant with the City, witnessed some of the events on June 6 and 7.  Taylor asked Densel to document her accounts thereof via email. (Doc. 14-7 at 6).  Densel wrote:

> [Middlebrooks] was waiting for [Dollar] or [Brannon] to address the situation this morning at my office.  As you know COVID is rapidly going through here again.  [Middlebrooks] was not comfortable being 3 [men] in the one garbage truck and told [Dollar] he was not going to do it.  [Middlebrooks] also mentioned to me that with this change he felt like he should have been offered his original job he was hired for back in recycle but was not given the opportunity to accept or deny it, and it was given to [another employee] who originally hired in as garbage collection.

(Doc. 14-1 at 6).

After he was placed on leave, Middlebrooks went to speak with Taylor.  Middlebrooks cannot identify with specificity when this meeting took place, only that it likely occurred at some point on or after June 9, 2022. (Doc. 14-2 at 19–20).  However, he remembers telling Taylor that "[Dollar] is up at public works telling people that

[Middlebrooks is] gay and queer." (*Id.* at 22).  In his deposition, Middlebrooks discussed specific examples of Dollar's alleged comments; however, Middlebrooks does not claim that he told Taylor about these examples.  First, Dollar was "running around telling people that [Middlebrooks] lived with a man." (*Id.* at 16).  Dollar also "drove by [Middlebrooks'] house and went to work and told the guys at work that [Middlebrooks] was dating a farmer from Eufaula because there was a truck in [Middlebrooks'] driveway." (*Id.*).  Additionally, Dollar told new workers "to be careful working with [Middlebrooks] at [an early] hour of the morning and . . . not to turn their back on [Middlebrooks], that [he] might poke them in the ass." (*Id.*).  As a result, at least one employee asked to not ride in the garbage truck with Middlebrooks. (*Id.* at 24).

Other employees testified to similar incidents.  Evelyn Goff ("Goff"), a female litter control officer with the City, said that when Middlebrooks first started working with the City, Dollar told her not to "go down there flirting with the new guy because he likes guys" and that Dollar hired Middlebrooks because "gay guys keep their stuff immaculate." (Doc. 18-5 at 5–6).  She heard Dollar tell other employees to "watch bending over" around Middlebrooks. (*Id.*).  Goff also walked into Dollar's office one day and heard him joking with another employee about Middlebrooks trying to kiss the other employee. (*Id.*).  On another occasion, she had her hair cut short, and Dollar asked her if she was "trying to be like [Middlebrooks]." (*Id.*).

While Taylor denies meeting with Middlebrooks about the alleged harassment, she does recall a separate conversation she had with Middlebrooks while he was still working in recycling.  According to Taylor, Middlebrooks expressed to her that "he did not think it

was fair that people were paid for eight hours of work and did not work eight hours on the garbage truck." (Doc. 14-7 at 5).

Pursuant to the City's employment policies, Middlebrooks was afforded a pre-disciplinary determination hearing on June 15, 2022, before the Mayor, who is ultimately responsible for determining discipline of City employees. (Doc. 14-1 at 7; doc. 14-4 at 56–58).  "The purpose of the hearing was to consider charges that [Middlebrooks] violated City policy . . . and to allow [Middlebrooks] an opportunity to respond to and address these charges." (Doc. 18-11).   The alleged policy violations included refusal to carry out instructions, neglect of duty, and insubordination. (Doc. 14-1 at 7).   At the hearing, Middlebrooks made no mention of any harassment or discrimination. (Doc. 14-2 at 29). The Mayor officially terminated Middlebrooks on June 17, 2022, and he did not appeal the decision. (Doc. 18-11).  On July 13, 2022, Middlebrooks heard from someone, but could not remember who, that Dollar "asked [another employee] if [Middlebrooks] was suing . . . because [Dollar] called [him] gay." (Doc. 14-2 at 21).  Upon the Equal Employment Opportunity Commission's dismissal of his charge and granting of his right to sue, Middlebrooks filed his complaint on April 4, 2023. (Doc. 1).

## V.  DISCUSSION

Middlebrooks brings two counts arising out of his prior employment with the City. In Count One, he alleges that he was harassed by Dollar and that the City discriminated against him by terminating him because of his sexual orientation.  In Count Two, he alleges that the City retaliated against him by terminating him because he complained to human resources that he was being harassed by Dollar due to his sexual orientation.  The City

argues that it is entitled to summary judgment because any alleged harassment was not severe or pervasive and because Middlebrooks was fired for a legitimate reason—insubordination—and not because of discrimination or retaliation.

## A.    Count One: Harassment and Discrimination

In Middlebrooks' complaint, he asserts in Count One claims for both discrimination and harassment.   In his opposition to the City's motion for summary judgment, Middlebrooks does not set out the elements of or analyze a harassment/hostile work environment claim; instead, Middlebrooks' analysis focuses on his claim that he was unlawfully terminated because he is gay.   Nonetheless, in his brief, Middlebrooks does discuss multiple instances in which, according to him, Dollar made inappropriate comments about Middlebrooks' sexuality, which would be relevant to a hostile work environment claim and a discrimination claim.   Accordingly, the Court will analyze both his harassment and discrimination claims, beginning with harassment.

### 1.  Harassment

To prove a hostile work environment claim, a plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment was based on his protected characteristic, and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).   "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Id.*  In evaluating whether harassment is severe or pervasive, courts look to the totality

of the circumstances, including factors such as (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's job performance. *See Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).   Additionally, a plaintiff "must prove that the environment was both subjectively and objectively hostile." *Reeves*, 594 F.3d at 809.   "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (quoting *Harris*, 510 U.S. at 21–22).   "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23).

The record establishes that Middlebrooks, as a gay man, is a member of a protected group, *see Bostock v. Clayton County*, 590 U.S. 644, 659 (2020); he did not welcome Dollar's alleged comments (doc. 14-2 at 18); and Dollar's alleged comments were based on Middlebrooks' sexual orientation (*Id.* at 16).   The dispute comes down to the fourth prong:  whether Dollar's conduct was "sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive work environment." *See Reeves*, 594 F.3d at 808.   Middlebrooks has presented a number of instances in which Dollar made inappropriate and offensive comments about Middlebrooks and his sexual orientation.   Dollar claimed to have hired Middlebrooks in reliance on the stereotype that

10

"gay guys keep their stuff immaculate." (Doc. 18-5 at 6).  On at least two occasions, Dollar told other employees to "watch bending over" (*id.* at 15) around Middlebrooks and that he might "poke them in the ass," (doc. 14-2 at 16).  As a result, certain employees asked to not ride in the garbage truck with Middlebrooks. (*Id.* at 24).   Dollar also joked about Middlebrooks' sexual orientation to other employees, suggesting that Middlebrooks tried to make sexual advances on them or that Goff, with her short haircut, was "trying to be like [Middlebrooks]." (Doc. 18-5 at 5–6).  The Court acknowledges that these comments, if they were made, were inappropriate, offensive, and unacceptable in the workplace. Nevertheless, Middlebrooks has failed to establish that these comments were sufficiently "severe or pervasive to alter the terms or conditions of [his] employment." *Reeves*, 594 F.3d at 808.

Middlebrooks has not adequately identified the dates or time period over which Dollar's conduct occurred, and the Court cannot conclude that Dollar's comments were so "commonplace, overt[,] and denigrating that they created an atmosphere charged with [homophobic] hostility." *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir. 1990).  Middlebrooks worked for the City with Dollar as his supervisor for almost two years.  "Although offensive, such instances of [homophobic] language, extending over a period of . . . two years, are too sporadic and isolated to establish that [Dollar's] conduct was so objectively severe or pervasive as to alter the terms and conditions of [his] employment." *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008).    Further, Middlebrooks relies on certain comments from Dollar that were neither severe nor offensive.  For example, Dollar told employees that Middlebrooks was dating a male

farmer and living with a man. (Doc 14-2 at 16).  While Middlebrooks did not want Dollar discussing his personal life, these factual observations of Middlebrooks' life are not inherently offensive and, on this record, do not rise to the level of harassment.  And Middlebrooks points to no evidence in the record demonstrating that the alleged harassment was physically threatening.  He claims he was subject to "public humiliation" when Dollar sent him home in a room full of hourly employees, but that was the location in which Middlebrooks informed Dollar he would not ride in the truck again and any humiliation he may have felt was unrelated to his sexual orientation. (Doc. 18-1 at 13).  While Middlebrooks claims that at least one employee refused to ride with him in the garbage truck after talking to Dollar, this is insufficient to show that Dollar's alleged harassment "unreasonably interefer[ed] with [Middlebrooks'] work performance."  *See Allen*, 121 F.3d at 647 (citing *Harris*, 510 U.S. at 23).  Accordingly, no reasonable jury could find that Dollar's alleged conduct was sufficiently "severe or pervasive to alter the terms or conditions of [Middlebrooks'] employment," and summary judgment is therefore due to be granted on the harassment claim. *See Reeves*, 594 F.3d at 808.

### 2.  Discrimination

Title VII makes it unlawful for an employer to "discriminate against any individual" regarding the terms and conditions of his employment "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In *Bostock*, the Supreme Court held that this prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation. 590 U.S. at 659.  A plaintiff can prove discrimination through direct or circumstantial evidence.  Absent direct evidence of discrimination, a

plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Because Middlebrooks has not offered direct evidence of discrimination, the Court addresses his claims under the *McDonnell Douglas* framework.  Under this framework, an employee creates a presumption of unlawful discrimination by first establishing a prima facie case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*").  The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253).  If the employer articulates a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's proffered reason is pretext for unlawful discrimination. *See Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).

The *McDonnell Douglas* framework, however, is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)) (footnote omitted).  A plaintiff may establish a "convincing mosaic" with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of

discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (quoting *Silverman*, 637 F.3d at 733, *overruled on other grounds by Ortiz*, 834 F.3d at 760).  The Court begins by analyzing Middlebrooks' discrimination claim under the *McDonnell Douglas* framework before turning to the convincing mosaic.

### a.  *McDonnell Douglas*

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Middlebrooks must show that:  (1) he belongs to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to perform the job in question, and (4) his employer treated "similarly situated" employees outside his protected class more favorably. *See Lewis I*, 918 F.3d at 1220–21.  The first three prongs of the framework are not disputed.  As a gay man, Middlebrooks is a member of a protected class under Title VII. *See Bostock*, 590 U.S. at 659.  His termination is an adverse employment action. *See Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004), *overruled on other grounds by Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006).  And, based on his performance reviews and Dollar's deposition testimony, Middlebrooks was qualified to perform his job with the City. (Doc. 14-1 at 19–21; doc. 18-4 at 6).  The dispute ultimately comes down to the fourth prong:  whether the City treated similarly situated heterosexual employees more favorably than Middlebrooks.  The Court begins by determining whether Middlebrooks introduced evidence of a proper comparator.

14

### i. Comparator

"To establish the fourth [*McDonnell Douglas*] prong, the plaintiff must present evidence of a comparator—someone who is 'similarly situated in all material respects.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (quoting *Lewis I*, 918 F.3d at 1224). "Although what constitutes a 'material' similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will:  have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment disciplinary history." *Id.* (citing *Lewis I*, 918 F.3d at 1227–28).  "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses. . . .  [A] plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis I*, 918 F.3d at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

While Middlebrooks does not clearly identify a comparator, he does reference another employee, Joshua, who worked in the same department and similarly requested a different job assignment due to COVID concerns.  Unlike Middlebrooks, Joshua was transferred to another department after he raised COVID concerns.  While Middlebrooks and Joshua may have had the same supervisor and been subject to the same employment policies, that is where their material similarities end.  First, with respect to Middlebrooks' claim that the City unlawfully terminated him because he is gay, Joshua is not a proper comparator on this record because Middlebrooks does not argue or present evidence that Joshua engaged in misconduct similar to Middlebrooks but was not terminated.  Instead,

Middlebrooks' argument is that Joshua was treated more favorably with respect to his request for a different job assignment.

Other material differences between Middlebrooks and Joshua preclude a finding that Joshua is a proper comparator. Middlebrooks had been written up once prior to the incident that resulted in his termination, and there is no evidence in the record that suggests Joshua shares this disciplinary history. (Doc. 14-1 at 17). Moreover, Middlebrooks does not identify evidence that Joshua was insubordinate like Middlebrooks. Requesting a new assignment was not the misconduct for which Middlebrooks was disciplined; rather, it was refusing to work after having such request denied. These material differences make Joshua an insufficient comparator.[2] Middlebrooks, therefore, fails to make out a prima facie case of discrimination under Title VII.

Assuming that Middlebrooks had established a prima facie case, the burden would then shift to the City to proffer a legitimate, nondiscriminatory reason for terminating him. Once the City satisfies its burden, the burden shifts back to Middlebrooks to show that the City's proffered reason for terminating him was pretextual. Assuming for argument's sake that Middlebrooks made out a prima facie case of discrimination—which he did not—the Court turns now to the remainder of the *McDonnell Douglas* analysis.

---

[2] The City, in its reply brief, asserts that Joshua "was moved from working in the City's sanitation department due to a personal medical issue." (Doc. 19 at 6). The City fails to cite record evidence in support of this assertion, and the Court was unable to find any.

### ii.   The City's nondiscriminatory explanation and pretext

The City has proffered insubordination as its nondiscriminatory reason for terminating Middlebrooks, which satisfies the City's "exceedingly light" burden at this stage. *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (citation omitted).  Thus, Middlebrooks must show that the City's proffered reason is pretext for unlawful discrimination.  A plaintiff can show pretext by (1) "casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct," (2) "showing that the employer's articulated reason is false and that the false reason hid discrimination," or (3) "establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis II*, 934 F.3d at 1186.  Middlebrooks cannot overcome summary judgment "by simply quarreling with the wisdom" of the City's explanation for his termination. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Instead, he must address the explanation "head on and rebut it." *Id.*

While Middlebrooks does not clearly argue pretext, he identifies several pieces of evidence which he suggests undermine the City's proffered reason for terminating him: (1) Middlebrooks never refused to work but instead requested a different assignment due to his concerns with COVID; (2) he had only received one write-up prior to the incidents in question and was known to be a good employee; and (3) he was written up for termination by Dollar, who made numerous inappropriate comments about his sexual orientation over the course of his employment. (Doc. 18-1 at 18–20).

The Court begins with Middlebrooks' argument that he did not refuse to work but merely requested a different assignment due to concerns with COVID.  In support, Middlebrooks cites his own deposition testimony that he was not refusing to work and that he was "begging to do something." (Doc. 18-1 at 8) (quoting doc. 14-2 at 14–15).  But when this Court "assess[es] whether an employer has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether the employer in good faith believed that the employee had done so." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc); *see also Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."), *overruled on other grounds by Lewis I*, 918 F.3d 1213.  The relevant question "is not the wisdom or accuracy of [the employer's] conclusion that [the employee's] performance was unsatisfactory, or whether the decision to fire [him] was 'prudent or fair.'" *Alvarez v. Royal Atl. Devs.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).  Instead, the Court's "'sole concern is whether unlawful discriminatory animus motivate[d]' the decision." *Id.* (quoting *Rojas*, 285 F.3d at 1342).  The Eleventh Circuit has cautioned courts to "be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." *Gogel*, 967 F.3d at 1148 (quoting *Alvarez*, 610 F.3d at 1266).

On this record, the City had a good faith belief that Middlebrooks engaged in insubordination when he did not perform his assigned job duties for two consecutive days. On June 6 and 7, 2022, Middlebrooks refused Dollar's, his supervisor, instructions to ride

in the garbage truck cab with two other employees to perform garbage collection. Middlebrooks and Dollar agree that Middlebrooks did not ride in the cab on either occasion; Middlebrooks merely disputes the City's characterization of his actions as a refusal to work. Middlebrooks' differing characterization, however, is insufficient to create a genuine dispute of material fact as to whether the City's proffered reason for terminating him was pretextual for sexual orientation discrimination.

Joshua making a similar request for a different job assignment and having it granted does little to help Middlebrooks' case because, for the reasons discussed above, Joshua is not a proper comparator. Middlebrooks' invocation of the City's alleged differential treatment of Joshua is insufficient for a reasonable jury to find that the City's termination decision was motivated by Middlebrooks' sexuality.

Next, Middlebrooks claims that his termination for these incidents after being known as a good worker and only receiving a single previous disciplinary infraction is an escalation in disciplinary action that points to pretext. But this argument misunderstands the role of Title VII and of the Court in its application. Courts "do not sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions." *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030). "[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not discriminatory." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *overruled on other grounds by Lewis I*, 918 F.3d at 1213. So, assuming without deciding that his termination was an unfair escalation in discipline, Middlebrooks must show "not just that

19

[the City's] proffered reasons for firing [him] were ill-founded but that unlawful discrimination was the true reason." *See Alvarez*, 610 F.3d at 1267.  The record establishes that Middlebrooks was insubordinate.  Middlebrooks admitted in his deposition that he was insubordinate on June 6 and 7 of 2022. (Doc. 14-2 at 26).  Indeed, when asked why he thought he was fired, Middlebrooks answered, "for refusing to do what I was told." (Doc. 14-2 at 29).  Middlebrooks' argument amounts to little more than "quarreling with the wisdom" of the City's chosen form of discipline, which is insufficient to demonstrate pretext. *See Kidd*, 731 F.3d at 1206 (quoting *Chapman*, 229 F.3d at 1030).

Moreover, Middlebrooks marshals insufficient evidence that the City acted arbitrarily or contrary to its formal policies in handling Middlebrooks' termination.  The City's employee handbook lists causes for disciplinary action and procedures for deciding what type of discipline is appropriate. (Doc. 14-4 at 56).  The handbook lists thirty-two reasons for which an employee may be disciplined and entitles an employee facing suspension without pay for three or more days, demotion, or dismissal to a hearing and seven days' notice thereof. (Doc. 14-4 at 55–58).  Within three days of the hearing, the Mayor must then make a decision. (*Id.*)  After the Mayor makes his decision, an employee has an automatic right to appeal it within five days. (*Id.*)  Pursuant to these policies, Middlebrooks was written up for insubordination by Dollar on June 6 and 7, 2022 when he refused to perform his job duties.  On June 9, he received a letter detailing the policies he was charged with violating and notifying him of his determination hearing, which was later held on June 15, 2022.  Middlebrooks attended his determination hearing but made no mention of Dollar's alleged harassment. (Doc. 14-2 at 29).  The City informed

Middlebrooks of the Mayor's decision to terminate him on June 17, 2022, and he chose not to appeal this decision. Thus, Middlebrooks has not presented evidence that the City acted arbitrarily or out of line with its policies.

Finally, Middlebrooks argues that the combination of Dollar's inappropriate comments over the course of Middlebrooks' employment and Dollar's recommendation that he be terminated indicates a discriminatory motive on the part of the City. The record shows that Dollar knew Middlebrooks was gay when he encouraged him to apply to work for the City, solicited Middlebrooks' help with extra garbage collection, and wrote Middlebrooks positive performance reviews. (Doc. 18-4 at 5). The only other time Dollar wrote Middlebrooks up for discipline was in December 2021 when Middlebrooks was a "no call no show" to his shift. (Doc. 14-1 at 17). Dollar had the authority under the City's personnel policy to recommend harsher discipline for Middlebrooks from this incident, but he did not. Instead, Dollar gave Middlebrooks the lowest form of discipline possible—a reprimand. Additionally, Middlebrooks fails to identify sufficient record evidence showing that Dollar's alleged inappropriate comments were especially frequent or severe in the period immediately preceding his termination. While the Court does not suggest that such evidence would change the outcome, the lack of such evidence further underscores the Court's conclusion that Middlebrooks has failed to show pretext. On this record, Dollar's alleged inappropriate comments fail to demonstrate that insubordination was pretext for unlawful sexual orientation discrimination.

Accordingly, the Court finds that Middlebrooks has failed to demonstrate that the City's proffered reason for his termination—insubordination—is a pretextual cover for unlawful discrimination.

### b.  Convincing Mosaic

Middlebrooks' failure to satisfy *McDonnell Douglas* does not necessarily doom his Title VII discrimination claim.  Instead, he may survive summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (quoting *Smith*, 644 F.3d at 1328).  Middlebrooks, however, does not argue that a convincing mosaic exists.  Indeed, the record does not support such a finding.

The decision to terminate Middlebrooks was not made at a suspicious time, nor were there ambiguous statements surrounding his termination.  Middlebrooks was insubordinate for two consecutive days, placed on administrative leave, and then terminated.  There are no statements in the record that expressly or impliedly associate Middlebrooks' termination with his sexuality.   To the contrary, every statement, including those made by Middlebrooks, surrounding his termination focuses on his insubordination.

Similarly, Middlebrooks has failed to produce evidence of systematically better treatment of similarly situated employees.  Middlebrooks offered Joshua as a comparator, but their situations are materially different for the reasons discussed above.  And while there is evidence that Dollar discussed Middlebrooks' personal life in a way different than other employees, that alone does not demonstrate "systematically better treatment of similarly situated employees." *Lewis II*, 934 F.3d  at 1185.  Other than these comments and

Joshua's transfer, Middlebrooks has presented no evidence of any way in which the City treats heterosexual employees more favorably than non-heterosexual employees, much less systematically so.

Finally, Middlebrooks failed to demonstrate pretext, as discussed within the *McDonnell Douglas* analysis above.   The circumstantial evidence presented by Middlebrooks—viewed as a whole and in the light most favorable to him—thus does not create a reasonable inference of intentional discrimination.   Consequently, the City's motion for summary judgment is due to be granted as to Middlebrooks' discrimination claim.

**B.      Count Two: Retaliation**

Title VII prohibits retaliation against an employee who opposes any practice prohibited by Title VII, files a charge of discrimination under Title VII, or testifies, assists, or participates in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e–3(a). To make out a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must show that (1) he engaged in a protected activity, (2) his employer subsequently took a materially adverse employment action against him, and (3) the adverse action was causally connected to the protected activity. *See Gogel,* 967 F.3d at 1134–35.   To prove a causal connection, a plaintiff must establish that his "protected activity was a but-for cause of the alleged action by the employer," *id.* at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)), or, put differently, that had he not engaged in the protected conduct, he would not have been fired, *id.* (citing *Jefferson v. Sewon Am., Inc.,* 891 F.3d 911, 924 (11th Cir. 2018)).   If a plaintiff presents a prima facie case, there is a "presumption that the

adverse action was the product of an intent to retaliate." *Id.* (citing *Bryant*, 575 F.3d at 1308). The burden then shifts to the employer "to rebut the presumption by articulating a legitimate, [non-retaliatory] reason for the employment action. *Id.* "If the employer produces such a reason, the presumption is rebutted, and the [employee] must then demonstrate that the 'proffered reason was merely . . . pretext.'" *Id.* (quoting *Bryant*, 575 F.3d at 1308).

Like with a Title VII discrimination claim, failing to establish a prima facie case of retaliation under the *McDonnell Douglas* framework does not necessarily doom a plaintiff's case. A plaintiff can still present "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer retaliated against him for engaging in the protected activity. *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1342 (11th Cir. 2023). The Court begins by considering if Middlebrooks has made a prima facie case under *McDonnell Douglas*.

### 1. *McDonnell Douglas*

Middlebrooks asserts that he was terminated in retaliation for complaining about discriminatory conduct. Specifically, he claims he engaged in a protected activity in June 2022, when he complained to the human resources director, Lisa Taylor, about Dollar's comments at his sexual orientation. Assuming without deciding that Middlebrooks suffered an adverse employment action and engaged in a protected activity, the Court evaluates whether Middlebrooks can establish the requisite causal connection.

### a. Causal connection

"The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The temporal proximity must be "very close." *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A three-to-four-month delay is generally too long, *id.*, while a one-month gap might be sufficient. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir. 1986). "[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected." *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 640 (11th Cir. 2021).[3] And "[w]ithout some showing of awareness" by the decisionmaker of the protected activity, "the causal chain falls apart and the claim fails." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021).

Middlebrooks argues that the "close temporal proximity between [his] complaints and his termination strongly suggests a retaliatory motive." (Doc. 18-1 at 17). The Court disagrees. Middlebrooks fails to demonstrate a sufficient causal connection between his asserted protected activity—meeting with Taylor to report the harassment—and his subsequent termination. Specifically, he has not shown that the Mayor—the decisionmaker with respect to his termination—or Dollar—the supervisor who recommended him for discipline—were aware of his meeting with Taylor at the time of his termination. Taylor testified that, prior to determination hearings, she typically tells the Mayor that they "are

---

[3] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

going to have a determination hearing" but does "not give him the details of the determination hearing." (Doc. 14-7 at 8).  There is no evidence that she did not follow this normal course for Middlebrooks.  Dollar testified that he did not meet with the Mayor prior to the hearing, and Middlebrooks similarly failed to rebut that point. (Doc. 18-4 at 12). And while Dollar testified that the Mayor "normally asks what do we want to do" after the determination hearing, there is no indication that this conversation involved discussions of Middlebrooks' meeting with Taylor, or that Dollar even knew such meeting had occurred. (*Id.*).  Since there is no evidence that the Mayor knew of Middlebrooks' meeting with Taylor, there is no evidence that he terminated Middlebrooks in retaliation for that meeting.

Middlebrooks also argues that "[d]espite the serious implications of [Dollar's] recommendation, the [M]ayor did not engage in a thorough investigation or challenge Dollar's reasoning, and instead, he relied on Dollar's judgment, as indicated by Dollar's testimony that the Mayor typically followed his recommendations without question." (Doc. 18-1 at 20).  Construing his argument liberally, Middlebrooks appears to invoke the theory of "cat's paw liability" to show causation.  "This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory [or retaliatory] animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999) (quoting *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)).  "When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit

from the inference of causation that would arise from their common identity.  Instead, the plaintiff must prove that the discriminatory [or retaliatory] animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Id.* at 1331 (citing *Llampallas*, 163 F.3d at 1248).

Middlebrooks similarly fails to establish causation under the cat's paw theory.  For one, the Mayor conducted an independent investigation of Middlebrooks' alleged misconduct.  Taylor testified that "[o]nce [she and the Mayor] go into the hearing, he listens to the employee.  He listens to the supervisor and any department head, any witnesses that [they] have, and then he determines the outcome of that hearing." (Doc. 14-7 at 8).  Middlebrooks had the opportunity to speak on these sexual harassment allegations at the hearing but chose not to do so.  That Dollar met with the Mayor again upon the conclusion of the hearing and that the Mayor has "followed [Dollar's recommendation] both times" he has recommended someone for termination does not upset the reality that the Mayor conducted an independent investigation via the determination hearing and came to an independent conclusion that Middlebrooks was to be terminated for insubordination. (Doc. 18-4 at 13).

But even if the Mayor simply rubber stamped Dollar's recommendation, Middlebrooks has presented insufficient evidence that Dollar knew of Middlebrooks' meeting with Taylor prior to recommending him for termination.  Crediting Middlebrooks' guess as to when the meeting occurred, sometime on or after June 9, 2022, it still happened after Dollar wrote him up for termination on June 7, 2022.  If Dollar was not aware of the

protected activity, he could not have retaliated against Middlebrooks for taking it. *See Debe*, 860 F. App'x at 640.

Because Middlebrooks fails to establish a causal connection between his meeting with Taylor and his ultimate termination, he fails to make out a prima facie case of retaliation under Title VII.

### 2. Convincing Mosaic

Middlebrooks does not argue a convincing mosaic exists.  Nevertheless, he may establish one from which a jury could infer retaliation with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (quoting *Silverman*, 637 F.3d at 733, *overruled on other grounds by Ortiz*, 834 F.3d at 760) (footnote omitted).

Middlebrooks fails to present a convincing mosaic of evidence from which a reasonable jury could infer that he was terminated because of his meeting with Taylor. Beyond the lack of evidence as to when exactly this meeting took place, what exactly was discussed, what parties were present, and who was informed about it after it occurred, there is insufficient record evidence connecting this meeting to Middlebrooks' termination. While it is true that Middlebrooks was fired within a month of this meeting, Middlebrooks was already scheduled to have a determination hearing on June 15, 2022, based on his insubordinate conduct before he met with Taylor.  Under the City's employment policies, he was owed a decision no later than June 18, 2022.  Middlebrooks fails to show that his

meeting with Taylor contributed in any way to the determination hearing being set, nor that it factored into the Mayor's decision to terminate him based on his policy violations.

As discussed above, Middlebrooks fails to present sufficient evidence of systematically better treatment of similarly situated employees or that the City's justification for terminating him was pretextual.  The only other independent piece of evidence he offered to support his retaliation claim is that he received a phone call from someone on July 13, 2022 informing him that Dollar asked if he was suing because Dollar called him gay. (Doc. 14-2 at 21).  This statement is neither suspiciously timed nor ambiguous and was made almost a full month after Middlebrooks was terminated.

Middlebrooks has presented insufficient evidence to establish a relationship between his meeting with Taylor and his termination.  Thus, he has failed to present a convincing mosaic of circumstantial evidence from which a jury could find that the City retaliated against him.  Consequently, the City's motion for summary judgment is due to be granted as to Middlebrooks' retaliation claim.

## VI.  CONCLUSION

Middlebrooks has failed to present evidence from which a reasonably jury could infer that he was harassed, discriminated, or retaliated against in violation of Title VII, and the City is therefore entitled to summary judgment on all claims. Accordingly, for the reasons above and for good cause, it is

ORDERED that the motion for summary judgment (doc. 14) is GRANTED.

A separate Final Judgment will be entered.

DONE this 2nd day of December, 2024.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE